

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-2-2005

# Marshall v. Cathel

Precedential or Non-Precedential: Precedential

Docket No. 04-9007

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Marshall v. Cathel" (2005). *2005 Decisions*. Paper 190.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/190

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 04-9007

———————

ROBERT O. MARSHALL

v.

RON CATHEL*,
Administrator, New Jersey State Prison;
PETER C. HARVEY*,
Attorney General, State of New Jersey,
Appellants

*Pursuant to Rule 43(c), F.R.A.P.

———————

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 97-cv-05618)
District Judge:  Honorable Joseph E. Irenas

———————

Argued May 13, 2005

Before:   ROTH, RENDELL and BECKER, <u>Circuit</u> <u>Judges</u>

Robert E. Bonpietro    [ARGUED]
Office of Attorney General
of New Jersey
Department of Law & Public Safety
Division of Criminal Justice
Richard J. Hughes Justice Complex
Trenton, NJ  08625
   *Counsel for Appellants*

Stephen W. Kirsch   [ARGUED]
Office of Public Defender
25 Market Street
Richard J. Hughes Justice Complex
Trenton, NJ  08625
  *Counsel for Appellee*

OPINION OF THE COURT

RENDELL, Circuit Judge.

On May 5, 1986, Robert O. Marshall ("Marshall" or "Petitioner") was convicted in New Jersey state court of conspiring to murder and procuring the commission of the murder of his wife, Maria Marshall.  Almost twenty years after being sentenced to death for these offenses, Marshall petitioned

for and was granted habeas corpus relief by the United States District Court for the District of New Jersey, after we remanded the case for an evidentiary hearing on Marshall's claim that counsel was ineffective during the penalty phase of his capital trial. The District Court had jurisdiction pursuant to 28 U.S.C. §§ 2241 and 2254; our appellate jurisdiction arises under 28 U.S.C. §§ 1291 and 2253. Before us is Respondents' appeal challenging the District Court's determination regarding counsel's ineffectiveness and Marshall's entitlement to relief. For the reasons set forth below, we will affirm the District Court's order granting Marshall's habeas petition, vacating his death sentence, and remanding to the state court for a new sentencing hearing.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

As chronicled in no less than six published opinions, the procedural history of this capital conviction is extensive.[1]

---

[1] *See State v. Marshall*, 123 N.J. 1, 586 A.2d 85 (1991) ("*Marshall I*") (affirming sentence of death on direct appeal); *State v. Marshall*, 130 N.J. 109, 613 A.2d 1059 (1992) ("*Marshall II*") (denying Marshall's claim that a sentence of death was not proportional to his crime of conviction); *State v. Marshall*, 148 N.J. 89, 690 A.2d 1 (1997) ("*Marshall III*") (affirming denial of Marshall's petition for post-conviction relief); *Marshall v. Hendricks*, 103 F. Supp. 2d 749 (D. N.J. 2000) ("*Marshall IV*") (denying Marshall's application for writ

Because the issue before us is relatively narrow – as compared to the universe of claims lodged over the years by Marshall in his numerous appeals and petitions for post-conviction relief – we will instead provide only the procedural history and facts relevant to the instant issue concerning counsel's effectiveness at the penalty phase of trial.

Maria Marshall was murdered on September 6, 1984. The investigation into her death soon led police to Louisiana, more specifically, to three men, all of whom were somehow connected to Robert Marshall – Robert Cumber, Billy Wayne McKinnon, and James "Jimmy" Davis. Evidence ultimately was presented at trial establishing that Cumber had met Marshall at a New Jersey party in May of 1984 and referred him to McKinnon, a former sheriff's officer, whom Marshall would

---

of habeas corpus on all grounds); *Marshall v. Hendricks*, 307 F.3d 36 (3d Cir. 2002) ("*Marshall V*") (affirming district court's denial of habeas relief as to the guilt phase of Marshall's trial and remanding for further evidentiary development as to ineffectiveness of counsel in the penalty phase); and, *Marshall v. Hendricks*, 313 F. Supp. 2d 423 (D. N.J. 2004) ("*Marshall VI*") (granting Marshall's petition for relief based on ineffectiveness of counsel in the penalty phase).

Throughout the course of this action, these opinions sometimes have been referred to as "*Marshall I*," "*Marshall II*," "*Marshall III*," *Marshall IV*," *Marshall V*," and "*Marshall VI*." For purposes of clarity, we will preserve those designations herein.

4

pay to carry out the murder of his wife.[2]  At trial, McKinnon testified that he was hired by Marshall to kill Maria but that another man unknown to Marshall, Larry Thompson, had actually pulled the trigger, killing Maria Marshall at a rest stop on the Garden State Parkway as she and her husband were returning from an evening at an Atlantic City casino.  On September 21, 1984, investigators visited Robert Marshall in his home and questioned him for the first time about his knowledge of, and relationship with, McKinnon and Davis.  The following day, Marshall contacted attorney Glenn Zeitz, and the two had an initial meeting in Zeitz's office on September 25, 1984.  Within days of retaining Zeitz, Marshall checked himself into a hotel where, once alone in his room, he telephoned each of his sons – Robert, Chris, and John – and prepared five audio tapes: one for each son; one for his brother-in-law and family attorney, Joseph Dougherty; and lastly, one for his secretary.  The calls and tapes were suicide notes of sorts – after placing the calls and recording the tapes, still in his hotel room, Marshall mixed a large quantity of prescription sleeping pills into a soda, which he later claimed that he had intended to drink.  He fell asleep before doing so.

The tapes to his secretary and his sons did not contain any incriminating statements as such.  However, the Dougherty tape discussed Marshall's relationship with a paramour, including his

---

[2]McKinnon used the alias James (or Jimmy) Davis when dealing with Marshall.  This same name was used on money transfers from Marshall, although McKinnon enlisted someone actually named James Davis to sign for the money.

5

plans to leave Maria, his escalating debt that had spiraled to almost $200,000, and his concerns that the police suspected his involvement in Maria's murder because he had hired McKinnon to find five or six thousand dollars that was missing.

The trial against Marshall and co-defendant Thompson began on January 27, 1986.[3] As part of its case in chief, the prosecution played for the jury the "suicide" tape Marshall had recorded at the hotel for Dougherty.[4] In presenting Marshall's defense, Zeitz also introduced certain of the tapes – those made for his three sons,[5] on which Marshall apologized for leaving

---

[3] Co-defendant Robert Cumber, charged with conspiracy to murder Maria Marshall and with purposely or knowingly causing the death of Maria Marshall as an accomplice, was tried separately, convicted on both counts, and sentenced to thirty-years imprisonment without eligibility for parole. *Marshall I*, 123 N.J. at 3-4. Co-defendant McKinnon, indicted for the same offenses as Cumber, secured an extremely favorable plea bargain – pleading guilty only to conspiracy to commit murder, offering up Thompson as the person who actually shot Maria Marshall, and agreeing to testify against Marshall. He was sentenced to five-years imprisonment and provided assistance with entry into the witness protection program. *Marshall V*, 307 F.3d at 46.

[4] Zeitz had unsuccessfully moved to suppress the tapes.

[5] The tapes were admitted into evidence over the objection of the prosecution.

them, expressed his love for the boys, and encouraged them to pursue successful lives.[6]  Zeitz also introduced evidence concerning Marshall's civic and charitable activities, and produced four character witnesses who testified to Marshall's general reputation for honesty and integrity.  In addition, Marshall took the stand in his own defense.

Closing arguments were held on March 3, 1986.  The court instructed the jury on March 4th, and the jury returned with its verdict late in the morning of March 5th, convicting Marshall of murder and conspiracy to commit murder.[7] Immediately thereafter, Marshall's family members, including his youngest son John, his sister Oakleigh De Carlo, and his brother Paul, left the courthouse to return to their home in Toms

---

[6]The tapes made for the boys were introduced during Robert Marshall's testimony.  Each of Marshall's sons, however, also were called to testify – not only about the content of the audio tapes, but about the phone calls their father had placed to them from the hotel around the same time as the recordings were made. John confirmed that when Marshall telephoned them on September 27, he had sounded "upset and depressed." *Marshall I*, 123 N.J. at 54.  Robbie testified that his father had sounded "shaky."  And Chris, Marshall's middle son, testified that Marshall sounded as though he was saying goodbye.

[7]Marshall's co-defendant, Larry Thompson, the alleged "shooter," presented alibi evidence at trial resulting in his acquittal.  No one was, or since has been, convicted of actually shooting Maria Marshall.

River, New Jersey, located roughly forty-five minutes away, apparently with no knowledge that the penalty phase was imminent.

While being escorted from the courtroom after the verdict was read, Marshall fainted. An ambulance took Marshall to the hospital where he was examined at 12:30 p.m., then discharged approximately 50 minutes later. He was back in the courtroom approximately 15-20 minutes later.

During Marshall's absence, Zeitz conferred with the prosecution concerning the penalty phase, and they reached an agreement as to how they would proceed. Of the three aggravating factors charged by the prosecution – (1) that the "defendant procured the commission of the murder by payment or promise of payment of anything of pecuniary value," N.J. Stat. Ann. § 2C:11-3(c)(4)(c); (2) murder for pecuniary gain, N.J. Stat. Ann. § 2C:11-3(c)(4)(d); and (3) the heinous nature of the offense, N.J. Stat. Ann. § 2C:11-3(c)(4)(e) – the State agreed to argue only the first of those factors, based on its case that Marshall had hired someone to kill his wife. The prosecution further agreed to stipulate to a single mitigating factor, that Marshall had no prior criminal record, N.J. Stat. Ann. § 2C:11-3(c)(5)(f). Defense counsel would retain the right to argue the second of its two filed mitigating factors – the "catch-all" factor set forth in N.J. Stat. Ann. § 2C:11-3(c)(5)(h), which provides that the jury may consider "any other factor which is relevant to the defendant's character or record or to the circumstances of the offense" – but both the prosecution and the defense would waive openings and limit themselves to a single short closing statement to the jury.

8

Upon Marshall's return from the hospital, Zeitz briefly conferred with his client. The penalty phase convened shortly thereafter at 1:45 p.m. that same day. Outside the presence of the jury but on the record, the parties explained their agreement to the judge, who allowed them to go forward as agreed and summarized as follows:

> COURT: As I understand it, what will now occur is that I will now make the usual opening statement to the jury that is made in this proceeding. I believe that the law now is I know that the law now is, expressly, that any evidence which was introduced in the trial can be considered as evidence for purposes of this proceeding. Given that, I understand that neither counsel intend[s] to introduce any further evidence in this proceeding.
>
> KELLY: That's correct, Judge.
>
> ZEITZ: That's correct, Judge. I would like, at least, to have the record reflect that I've had an opportunity to speak with my client, and discuss his right, if he desired, to call any witnesses with regard to the penalty phase of the proceedings, and it's his desire, and it is also my feeling, that we do not need to call any witnesses at this stage of the proceedings. And we've had, I believe, an opportunity to discuss this, and this is his intention.

*Marshall VI*, 313 F. Supp. 2d at 435. Per the agreement, Zeitz was first to address the jury; he offered the following statement, repeated here in its entirety:

9

ZEITZ: Yes. Thank you, your Honor. It would be an understatement for me to say that this is not a difficult moment for me, and I'm sure it's difficult for everyone in terms of the proceedings that we now have to deal with.

What, in essence, we are at right now at this stage is a situation where the State has agreed that there is one mitigating factor which you must find exists in the case, and that that [sic] Rob Marshall has never had any type of criminal record of any kind.

The reason why I believe, when you look to the legislative history of the death penalty when it came into New Jersey that that clearly is a mitigating factor, is because, if you will, people feel, and I think quite rightly, that if you live a law-abiding life, that at some point in time you may be in a position where you may have to ask people to allow you to draw, if you will, maybe a credit because of the fact that you've led such a life. There are people obviously who have not led law-abiding lives and have been in situations where they've been in front of a jury and the jury has convicted them of a capital offense, and the jury will hear that this person has led a life, not law-abiding, but in fact, has had a juvenile record, has had a record of other offenses and, for the most part, has lived a life that in all ways, shapes, and forms never conformed to what our society at least requires.

10

In this particular case it's been agreed that Rob Marshall has led a law-abiding life, and that you must consider that as a mitigating factor.

The State has one aggravating factor which they are going to ask you to consider, and that is the fact, under the statute, this offense as you have found - and at this point, as a lawyer, I have to accept that you have found that - was procured by the payment or the thought of payment for some pecuniary gain.

The other mitigating factor that Judge Greenberg referred to deals with other circumstances and factors which a jury may consider in mitigation with regard to the death penalty. In this particular case, in addition to the fact that Rob Marshall has no prior criminal record, there's certain things, at least with regard to his life, that he has done, which he is entitled for you to consider.

He was involved in, among other things, with the Ocean County Businessmen's Association. You've heard that. He was campaign chairman for United Way, and for a number of years worked with them in community affairs, raising money for United Way. In addition to that, he served with his family on various social activities, involving the swim leagues and certain other things of a community nature.

I don't want to stand here and go through the whole litany of things that he's done in forty-six years that - either for other people or for his family or of a civic

nature. Suffice it to say, the record is substantial in that area, and you have an absolute right to consider that as a mitigating factor.

As the Judge told you, now, in terms of a defense, we do not have to prove to you that the mitigating factors in some way outweigh the aggravating factor. The State has to prove to you, beyond a reasonablbe [sic] doubt, and you certainly know what that standard is, because you've been told that and you've been explained that by counsel, you have to use that standard when you determine whether or not you feel he deserves the death penalty.

One thing I have to tell you about this, which I think makes it an individual decision for each one of you, and that is that the only way that the death penalty can be imposed is if all twelve of you agree to do it unanimously. So that you, in essence, have a power in your hands that, quite candidly, I would never have in my hands, because, as a lawyer, we generally don't serve as jurors. So I have no way of knowing what it must be like.

All I can say is this, that I hope when you individually consider the death penalty, that you're each able to reach whatever opinion you find in your own heart, and that whatever you feel is the just thing to do, we can live with it.

*Id*. at 433-34. No documentary evidence or witnesses were presented, nor did Zeitz plead for the jury to spare his client's life. Marshall chose not to make a statement on his own behalf.

12

After only ninety minutes of deliberation, the jury sentenced Marshall to die by lethal injection. The jury unanimously found beyond a reasonable doubt the existence of the aggravating factor, and also found evidence of the existence of both mitigating factors. However, it concluded unanimously beyond a reasonable doubt that the aggravating factor outweighed the mitigating factors.

As noted above, the proceedings have been the subject of extensive judicial review. Relevant here is Marshall's claim that Zeitz rendered ineffective assistance of counsel during the penalty phase of the trial as described above. This claim was rejected by the New Jersey Supreme Court in *Marshall I*, 123 N.J. at 166 ("We are unwilling to second-guess counsel's strategic decision on this issue, particularly in view of the jury's determination that both mitigating factors offered had been established."), and then revisited and rejected for a second time in *Marshall III*, 148 N.J. at 254 ("[T]he contention that proper investigation and preparation would have unearthed new mitigating evidence that probably would have affected substantially the penalty-phase deliberations   is simply too speculative to warrant an evidentiary hearing.").

Initially, relying on the state court record, and without holding an evidentiary hearing, the District Court also denied this claim of ineffectiveness. *See Marshall IV*. Marshall appealed to this Court, leveling the following claims of ineffectiveness at the penalty phase: 1) The penalty phase should not have commenced immediately upon Marshall's return from the hospital; 2) Zeitz presented no mitigation evidence (even though the judge instructed the jury to decide the existence of

13

mitigating factors based on the evidence); 3) Zeitz failed to offer evidence to humanize Marshall, such as describing his childhood, his commitment to family, and his extensive community service; 4) Zeitz's statement to the jury was extremely brief and contained no request for mercy; 5) Zeitz never discussed the penalty phase with Marshall; and, 6) Zeitz never prepared for the penalty phase and conducted no investigation. We grouped these claims into two overarching categories: (1) lack of consultation, preparation, and investigation by counsel, and (2) lack of content or substance in counsel's representation at the penalty phase. In terms of analyzing these claims, however, we lacked a sufficient record to rule. "The difficulty we encounter here is that the picture is less than complete. We cannot, and the courts before us did not, evaluate Zeitz's decisions in light of his stated strategy." *Marshall V*, 307 F.3d at 106. "[T]here is no record before us as to what preparation or investigation, if any, was performed by counsel in anticipation of the penalty phase, nor is there any record of why counsel chose not to undertake investigation that we know he did not – *e.g.*, why he chose not even to contact many of Marshall's proffered mitigation witnesses." *Id.* We explained that, while we knew certain pieces of information, such as that Zeitz's usual practice was to take and date notes of conversations with Marshall, Zeitz's sparse testimony on these issues had been offered in response to unrelated questions at an evidentiary hearing held for a purpose other than to discern his effectiveness.[8]

_____

[8]When Marshall petitioned for state post-conviction relief, he requested a "complete evidentiary hearing to support the claims

14

> Because the only testimony from Zeitz was restricted to the two areas discussed above, we have no evidence from Zeitz himself regarding the scope or strategy of his preparation or investigation, or the choices he made in conducting the penalty phase as he did.
>
> To this date we have no information from counsel, or anyone else for that matter, that addresses the issues Marshall raises and from which we could make an informed assessment as to the reasonableness of counsel's actions – and, even more important – as to what counsel's decisions actually were at the time.

*Id.* at 108. Accordingly, we remanded the case to the District Court in order that an evidentiary hearing be held regarding these issues. The District Court held such a hearing and heard final oral arguments from the parties, after which it concluded that Zeitz's penalty phase representation had been constitutionally ineffective, granting Marshall a writ of habeas corpus pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.

---

raised in the petition through the presentation of testimonial and documentary evidence." *Marshall II*, 690 A.2d at 26. However, the Court granted a full evidentiary hearing as to only five of Marshall's claims, all of which related to defense counsel's promising, as part of his opening statement, that Marshall would take the stand, and to whether Marshall was competent to participate in the penalty phase, given his collapse following the verdict.

## II. THE EVIDENTIARY HEARING

Pursuant to our remand order in *Marshall V*, the District Court conducted an evidentiary hearing over the course of September 2003, during which Zeitz testified at length concerning his representation of Marshall. The testimony elicited at the hearing bears directly upon the questions that formed the basis for our remand, namely, what did Zeitz do to prepare for the penalty phase, and why did he conduct himself as he did during the penalty phase. Zeitz's hearing testimony, by itself, provides the answer to our inquiries – Zeitz did nothing in preparation, leaving him with no options during the penalty phase.

At the outset of his representation of Marshall, in 1984, Zeitz had defended clients who faced the death penalty. His testimony at the evidentiary hearing establishes that, based on his experience, he thought it probable, if not certain, that the State's case against Marshall would indeed implicate the death penalty:

> RESPONDENTS' COUNSEL: Mr. Zeitz . . . when you commenced representing Robert Marshall, were you mindful of the fact that there would be potentially a penalty phase or mitigation phase of this case?
>
> ZEITZ: Yes.
>
> RESPONDENTS' COUNSEL: And what sensitized you to that realization that there could be a penalty phase of Marshall's case?

ZEITZ: Well, obviously it was a death penalty case, and obviously I knew if he was convicted in the guilt phase I'd be confronted with a penalty phase.

RESPONDENTS' COUNSEL: Did you know that from the first time you became involved with the Marshall case, sir?

ZEITZ: I – the only way I can answer is as follows. When I first met him and interviewed him initially, and he told me what his version was of certain events, and answered certain specific questions that I had, I knew that at least in the first interview that this case clearly had the capacity of becoming a death case.

(Test. of Glenn Zeitz at A266.) Not only might it be a death penalty case, it was fast becoming a difficult case. Zeitz testified that he had, at that first meeting with Marshall, admonished Marshall "to keep his mouth shut" about his role in the ongoing investigation. (*Id.*) Notwithstanding this warning, as described above, within a few days Marshall checked himself into a hotel room, with the apparent plan of killing himself, where he made a series of recordings for important people in his life, including his brother-in-law, Joseph Dougherty. According to Zeitz, the Dougherty tape was nothing short of "devastating": "[I]t was my client in his own words making statements that later became consistent with, and almost in some ways, the foundation of . . . the State's case against him." (*Id.* at A333.)

Facing such "devastating" evidence of his client's guilt,

17

Zeitz testified that his focus became portraying Marshall to the jury as a likeable man:

> ZEITZ: So the hope was that I could – in his direct I would humanize him, I could show him to the jury as being someone that loved his children, and create this image ... the perception, if you will, that he and the three sons still had, if you will, a close relationship, and he cared about them.
>
> ***
>
> And Mr. Marshall and I talked about it, because it was our opinion and our strategic decision that we had to figure out a way to rebut and confront the tape that he created for his brother-in-law. [It] also gave us a mechanism in the guilt phase of the case to accomplish what he wanted to accomplish. I wanted to have a denial defense, maintain his innocence, be able to demonstrate to the jury that he was a human being, loved his kids and they loved him.

(Test. of Glenn Zeitz at A336, A338.) Zeitz testified that, at the close of evidence in the guilt phase of the trial, he was satisfied with the extent and nature of the humanizing evidence he had introduced on Marshall's behalf.

Although Zeitz had, in the time leading up to the commencement of the trial, hired an investigator named Russell Kolins to assist in gathering information relevant to Marshall's case, including the humanizing evidence referenced above, Zeitz

18

testified that at no time did either he or Kolins engage in pointed discussions with individual family members, friends, neighbors, or business associates to determine: (1) if any of those individuals would be willing to testify at a penalty phase *should Marshall be found guilty*; or (2) what those persons might say if called to testify.[9] Despite almost constant contact and communication with immediate members of Marshall's family, including his sons and sister, even these critical potential witnesses were never once interviewed or asked to testify in contemplation of the penalty phase. Kolins was the sole professional resource engaged by Zeitz to assist in gathering evidence of the sort that might serve as mitigating – Zeitz did not retain a mitigation specialist, social worker, or mental health expert[10] to evaluate Marshall, to interview potential witnesses,

---

[9]As noted by the District Court, at the evidentiary hearing Kolins testified that he had such conversations, "however, he has no notes of such conversations, he cannot identify names of the persons with which he spoke, nor can he identify the content of these discussions." *Marshall VI*, 313 F. Supp. 2d at 432 n.9. "Zeitz's files do not contain these notes either, even though Kolins claims to have turned over his notes to Zeitz." *Id.*

[10]Again, as noted by the District Court, Marshall did undergo a psychological evaluation prior to the start of trial, following his suicide attempt. *Marshall VI*, 313 F. Supp. 2d at 432 n.10. When Zeitz was notified about the incident and informed that Marshall had been admitted to Point Pleasant Hospital, Zeitz contacted Dr. Elliot Atkins and arranged for him to talk to Marshall. Shortly thereafter, Marshall was transferred to the

19

to investigate his school or medical records, or to conduct an investigation into the existence of any potentially mitigating information.

Therefore, when the jury rendered its verdict of guilty, Zeitz had nothing additional to put forth in the penalty phase and he knew it:

> RESPONDENTS' COUNSEL: [Y]ou've now got your client convicted, had you prepared some additional list of mitigating factors to have available to you in the event that the jury convicted your client?
>
> ZEITZ: Are you talking about did I have a working list – not statutory, non-statutory mitigating factors? The answer to that question is no.

---

Institute of Pennsylvania Hospital, a psychiatric facility, where he was treated by Dr. David Walzer. Although Zeitz recognized that "what the dynamics are in someone's mind . . . could affect a substantive defense, or how you handle a mitigation aspect of a case," he conceded that he never asked Dr. Atkins or Dr. Walzer for a report or diagnosis of Marshall's mental state, nor was he aware if a diagnosis was ever made. Zeitz testified that "he wanted to put a lid on" what he learned anecdotally from Dr. Walzer – that Marshall was narcissistic and manipulative, that he was behaving in a sexually provocative way with staff members and seemed to exhibit no remorse over the death of his wife. (Test. of Glenn Zeitz at A293.)

20

\*\*\*

RESPONDENTS' COUNSEL: You knew that the defense attorney's discovery obligation in a capital case, with respect to evidence used in mitigation in the penalty phase, kicks in at the moment the defendant is convicted of capital murder?

ZEITZ: You don't have to give it to them before ...

RESPONDENTS' COUNSEL: Exactly.

ZEITZ: Of course.

RESPONDENTS' COUNSEL: So, my question was then he was convicted on March 5th, 1986, did you have any documents, discovery of any kind, that you were considering to turn over as part of what you were going to present in the penalty phase?

ZEITZ: No.

\*\*\*

RESPONDENTS' COUNSEL: [D]id you have any other witnesses lined up as potential mitigation witnesses for the penalty phase, prior to reaching this agreement about not calling witnesses?

ZEITZ: No.

21

(Test. of Glenn Zeitz at A144-146.) This "agreement," whereby the prosecution stipulated to a single aggravating and single mitigating factor, and both parties consented to waive openings and limit themselves to a single short closing statement to the jury, was arrived at within an hour or so of the guilty verdict. Essentially, as Zeitz testified before the District Court, "There wasn't going to be any evidence produced by either side in the penalty phase of the case." (*Id.* at A100.)

As recounted by the prosecutor in the case, Kevin Kelly, whom Zeitz approached after the guilty verdict to discuss the penalty phase: Zeitz "asked me if I was going to produce any evidence [in the penalty phase.] I said, well, that's going to be up to you in terms of what you're going to do. And he said, well, I've already, in terms of mitigating factors, I've already presented everything during the course of my case in chief and during the trial and there is really nothing I can add to it." (Test. of Kevin Kelly at A633.) Kelly continued, "Mr. Zeitz felt, and he expressed to the Judge in chambers, that he had presented everything about Marshall's character, his reputation in the community, his standing in the community, his relationship with his family, a good father, so forth and so on, it's already been said and done during the case, and he said to the effect 'I have nothing else to add to that.'" (*Id.* at A640.) While Zeitz testified that his and Marshall's overall strategy for the trial contemplated being able to "take the position that the jury could incorporate into the penalty phase whatever they heard in the guilt phase of the case," (Test. of Glenn Zeitz at A341) he conceded that, during closing, he never stated so explicitly or alluded to the Marshall boys' guilt phase testimony. Zeitz had thought the sons' testimony during the trial was powerful:

22

"[T]he impact in the courtroom was there." (Test. of Glenn Zeitz at A341.) Clearly, Zeitz misjudged the effect of the testimony as a weapon against conviction, as the jury deliberated for only ninety minutes before returning with a guilty verdict. Its use as a weapon later in a plea for life remains untested.

Zeitz recalled having had two conversations with Marshall following the verdict regarding how to proceed in the penalty phase. These conversations were, of course, after Marshall had fainted, been examined at the hospital and returned to the courtroom. The first conversation focused on the agreement Zeitz had struck with the prosecution and whether Marshall's sons should testify in the penalty phase. Marshall stated that he did not want his sons to testify and that he approved the agreement. The second conversation confirmed with Marshall that, after discussing the proposed course of action with the judge, counsel would proceed per the agreement. Zeitz also testified that he informed Marshall that they could ask the judge for a postponement if that was what Marshall wanted: "And if I thought at that point in time that that was what we should do, and if he said to me that's what he would have wanted, we would have done that. But that wasn't what we wanted to do." (Test. of Glenn Zeitz at A106.)

## III. RELEVANT STANDARDS

In analyzing the merits of a habeas petitioner's claims, considerations under the AEDPA are divided; a federal court considers separately the state court's legal analysis and factual

23

determinations. *See* 28 U.S.C. § 2254(d)(1)-(2). When according deference under the AEDPA, federal courts are to review a state court's determinations on the merits only to ascertain whether the state court had reached a decision that was "contrary to" or an "unreasonable application" of clearly established Supreme Court law, or if a decision was based on an "unreasonable determination" of the facts. *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000) (section 2254(d)(1) is a command that a federal court not issue the habeas writ unless the state court was wrong as a matter of law or unreasonable in its application of law). To label a state court decision "contrary to" Supreme Court precedent, the state court must have reached a "conclusion opposite to that reached by the [Supreme] Court on a question of law or if the state court decides a case differently than the [Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 413.

An "unreasonable application" results where "the state court identifies the correct governing legal principle from the [Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* "In other words, a federal court may grant relief when a state court has misapplied a 'governing legal principle' to 'a set of facts different from those of the case in which the principle was announced.'" *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 155 L. Ed.2d 144, 123 S. Ct. 1166 (2003) (other citations omitted)). In order for a reviewing federal court to find a state court's application of Supreme Court precedent "unreasonable," the state court decision must be "more than incorrect or erroneous"; it must have been "objectively

unreasonable." *Id.* at 520 (citations omitted).

Here, the relevant "clearly established Supreme Court law" or "governing legal principle" concerning ineffective assistance of counsel is that honed by *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) and its progeny, under which a petitioner must demonstrate counsel's performance was deficient, that is, it "fell below an objective standard of reasonableness." 466 U.S. at 688. As explained by the Court in *Strickland*:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel's was unreasonable. . . . [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Id.* at 689. Where an attorney's actions are the result of "strategic choices" this presumption of reasonableness is even stronger. If the strategic choice is "made after thorough investigation of the law and facts relevant to plausible options," the Supreme Court has held that the presumption of reasonableness is essentially irrebuttable. *Id.* at 690. Even if an

25

attorney's strategic choice is made "after less than complete investigation," those choices are still considered "reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation . . . . In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 690-91. An attorney's duty to investigate is itself judged under a reasonableness standard based on "prevailing professional norms" such as those found in the ABA Standards for Criminal Justice. *See Wiggins*, 539 U.S. at 522-23.

Under *Strickland*, a petitioner also must demonstrate that he was prejudiced by the deficient performance. 466 U.S. at 688. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. To establish prejudice, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Therefore, "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691.

## IV. THE DISTRICT COURT OPINION

In its comprehensive and incisive opinion, the District

26

Court addressed several aspects of Zeitz's penalty phase assistance and, following the lead of this Court, *see Marshall V*, 307 F.3d at 98-99, grouped six individual allegations of deficient performance into two overarching categories:

> **(1) Lack of consultation, preparation, and investigation by counsel ("pre-penalty"):**
>
> 1. Zeitz failed to prepare for or investigate a case for life;
>
> 2. Zeitz failed to discuss the penalty phase with Marshall; and
>
> 3. Zeitz failed to request an adjournment and permitted the penalty phase to commence immediately after Marshall's return from the hospital.
>
> **(2) Lack of content or substance in counsel's representation at the penalty phase:**
>
> 1. Zeitz failed to present mitigating evidence during the penalty phase;
>
> 2. Zeitz failed to humanize Marshall; and
>
> 3. Zeitz failed to make a plea for his client's life.

*Marshall VI*, 313 F. Supp. 2d at 441. The District Court concluded that, although the state court had identified the correct legal principles governing Marshall's claims of ineffectiveness, namely *Strickland*, and thus its decision to deny

27

Marshall relief was not "contrary to" established Supreme Court precedent, the state court's application of that precedent so as to find that Zeitz's representation had been effective was "objectively unreasonable." *Marshall VI*, 313 F. Supp. 2d at 455. Therefore, the District Court concluded, Marshall was entitled to relief under the AEDPA.

With respect to the adequacy of investigation, preparation and consultation, the District Court found that neither Marshall's obstreperousness as a client, nor Zeitz's protestations that he had gathered sufficient mitigation evidence even though not as part of a penalty phase investigation, rendered Zeitz effective or his conduct reasonable. *Id.* at 452-53. The Court concluded that, "at a bare minimum, Zeitz was required to have specific discussions with Marshall and his family members about the possibility of a penalty phase, what a penalty phase entails and a discussion with each person individually as to whether he or she would have been willing to testify and what he or she would have said." *Id.* To this end, in its opinion, the District Court painstakingly detailed the "apparent plethora of potentially useful mitigation witnesses available to the defense at the time of the trial," *id.* at 444, discussing the substance of what more than fifteen witnesses had testified they would have said about Marshall had they been asked to take the stand on his behalf during the 1986 penalty phase. The list of would-be mitigation witnesses includes family members, childhood friends, neighbors and business associates. *Id.* at 444-45 n.29-44. "Here, Zeitz's representation fell below the professional standard because he failed to conduct any investigation into possible mitigating factors and provides no objectively reasonable justification for failing to do so." *Marshall VI*, 313

28

F. Supp. 2d at 444 (citing, e.g., *Dobbs v. Turpin*, 142 F.3d 1383, 1387 (11th Cir. 1998) (affirming the district court's finding that defense counsel's representation was ineffective where counsel had failed to conduct a reasonable investigation of defendant's background and produced no mitigating evidence at the penalty phase) (other citations omitted)). Moreover, in light of this utter lack of preparation, the District Court found Zeitz's decision not to ask the trial court for a continuance before commencement of the penalty phase even more incredible:

> We are convinced that no reasonable attorney in Zeitz's position would have gone forward without an adjournment. Zeitz did not have a single witness ready to testify, nor was he aware of any useful mitigating evidence aside from a cursory understanding of Marshall's charitable work and the fact that he had no prior criminal record. Zeitz's decision to move forward also ensured that Marshall's family would not be present during the proceedings because Marshall's sister Oakleigh had taken John and other family members home earlier in the day, mistakenly believing that the penalty phase would not start that afternoon.

*Id.* at 449-50 (internal footnote omitted).[11]

---

[11]One aspect of Zeitz's pre-penalty performance the District Court found not to have fallen below constitutional standards was the failure to obtain records or documentary evidence of Marshall's charitable activities. On this point, the District Court concluded, "we are satisfied that Zeitz acted reasonably."

29

As to those claims relating to the substance, or lack thereof, of Zeitz's penalty phase presentation, the District Court properly noted as a threshold matter that its analysis was colored by Zeitz's failings up to that time: "Because Zeitz did not engage in a reasonable investigation prior to the penalty phase, his subsequent decisions do not enjoy the same deference as decisions made after proper investigation and preparation." *Marshall VI*, 313 F. Supp. 2d at 453 (citing *Strickland*, 466 U.S. at 690-91, and *Wiggins*, 123 S. Ct. at 2535-39). Again, the District Court found that Zeitz's representation had been substandard and that Marshall was prejudiced by the inadequate performance, and had thus violated *Strickland's* dictates. The District Court correctly noted that "no absolute duty exists to introduce mitigating or character evidence," *Chandler v. United States*, 218 F.3d 1305, 1319 (11th Cir. 2000), but concluded that:

> [t]his is not a case where, after reasonable investigation, Zeitz determined that it was tactically a better choice not to put on a mitigation case. Rather, it is a situation where Zeitz inadequately prepared for the penalty phase and put on no mitigating evidence because he had none to present. Zeitz only provided the jury with a stipulation that Marshall had no prior criminal record and an embarrassingly superficial mention of Marshall's charity work. Therefore, Zeitz's decision was not a reasonable strategic choice, but an abdication of his constitutional duty. Nothing in the record provides a reasonable

*Marshall VI*, 313 F. Supp. 2d at 448.

30

professional justification to support a decision not to present a case for life.

*Id.* at 453-54. Consonantly, the District Court noted, there exists no *per se* rule requiring counsel to plead for his client's life, *Bell v. Cone*, 535 U.S. 685, 701, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002), but, "given the complete lack of investigation prior to the penalty phase and Zeitz's limited and cursory closing statement, Zeitz's decision not to ask the jury to spare his client's life seems incomprehensible." *Marshall VI*, 313 F. Supp. 2d at 454. Having described in detail all aspects of Zeitz's challenged penalty phase representation, the District Court succinctly summarized, stating that it had "no confidence that the penalty phase of Marshall's trial was a genuine adversarial proceeding, the assurance of which is at the very heart of the right to counsel under the Sixth Amendment." *Id.* at 457.

## IV. DISCUSSION[12]

Like the District Court, we have little confidence that Marshall was afforded the guarantees to which he is entitled under the Sixth Amendment and, therefore, we concur with its

---

[12]Where the district court conducts an independent evidentiary hearing, we exercise plenary review over matters of law; we review the district court's findings of fact for clear error. *Whitney v. Horn*, 280 F.3d 240, 249 (3d Cir. 2002).

31

findings and legal conclusions. As the District Court detailed, the several categories of Zeitz's failures correspond closely with familiar principles of substandard attorney conduct often alleged in connection with penalty phases or capital cases. Before us we have, at the same time, and intersecting often, claims of failure to investigate, failure to present mitigating evidence, failure to make a plea for life, and failure to humanize (and recognize the distinct nature of the penalty phase separate and apart from the guilt phase).

Much has been written, and opined, about each of these separate types of claims, and the bounds of attorneys' duties with respect thereto. Very often claims of inadequate investigation and failure to present mitigating evidence involve the existence of actual facts that were either known or unknown, or were later discovered, that may well have altered the jury's view of the balance struck between aggravating and mitigating evidence. *See*, *e.g.*, *Rompilla v. Beard*, __ U.S. __, 125 S. Ct. 2456, 2467, 162 L. Ed. 2d 360 (2005) ("It flouts prudence to deny that a defense lawyer should try to look at a file he knows the prosecution will cull for aggravating evidence, let alone when the file is sitting in the trial courthouse, open for the asking."); *Wiggins*, 123 S. Ct. at 2542 ("[P]ostconviction interviews with Wiggins himself and with members of his family produced evidence of severe abuse."); *Jermyn v. Horn*, 266 F.3d 257, 306 (3d Cir. 2001) ("Counsel failed to investigate the circumstances surrounding Jermyn's childhood, even though counsel admitted at the PCRA hearing that he was aware that Jermyn had claimed that he was abused as a child."). However, we have, presented here, a very different case. We have significant failings in several specific areas coupled with the

most elementary misstep of all – a total failure of Zeitz to prepare for the penalty phase of the trial.

Zeitz's testimony before the District Court at times seeks to explain this abdication, but when viewed in perspective, the lack of preparation is striking and inexplicable. Moreover, it clearly doomed Marshall:

- The testimony is crystal clear that up until the moment the verdict was announced, Zeitz had performed no preparation for the penalty phase, failing to interview witnesses, accumulate documentary evidence, or engage experts of any kind to aid in the development of mitigation material;

- Zeitz then proceeded not to request a continuance in order to investigate and perhaps develop such evidence but, instead, chose to strike an "agreement" whereby he simply agreed not to do what he was already unable to do – mount a case for life.

- Despite testimony from Zeitz alluding to his strategy of incorporating at the penalty phase the strong humanizing evidence from the guilt phase, at the penalty phase Zeitz merely made a brief statement, recalling only a few bits of evidence from the trial – superficial charitable and family events which seemed almost bizarre in retrospect – omitting reference to Marshall's sons, and

33

making no plea for Marshall's life.

- The rationale for "choosing" this route range from weak to nonexistent. As the District Court concluded, and we noted above: "This is not a case where, after reasonable investigation, Zeitz determined that it was tactically a better choice not to put on a mitigation case. Rather, it is a situation where Zeitz inadequately prepared for the penalty phase and put on no mitigating evidence because he had none to present." *Marshall VI*, 313 F. Supp. 2d at 453.

As recounted above, from the time of his very first meeting with Marshall in September of 1984, Zeitz was aware, if not convinced, that Marshall's case would implicate the death penalty. "I knew that at least in the first interview that this case clearly had the capacity of becoming a death case." (Test. of Glenn Zeitz at A266.) By December of 1984, Marshall had been arrested and he was indicted early the following year. Zeitz testified that, following these developments, in a meeting with Marshall, he again alluded to the then-certain capital nature of the case facing his client:

ZEITZ: I went to see him in January when he was indicted and I delivered at that time the notice of aggravating factors to him, and I also delivered the notice of mitigating factors which I had filed, and I sat and talked with him in the jail and explained to him these are the aggravating factors, these are the mitigating factors, the state filed this, we filed this, and we had discussions

34

then and thereafter with regard to what would happen if we got to the penalty phase.

(*Id.* at A141.) Marshall, however, testified that he did not recall ever receiving anything referencing aggravating factors, nor did Zeitz discuss with him the procedures employed in a capital case should they face a conviction. "We didn't have any discussions about my being convicted." (Test. of Robert Marshall at A704.) Whether or not Zeitz discussed with Marshall what would happen should they find themselves confronted with a penalty phase, Marshall's trial did not begin for roughly one year after the indictment, and, all the while, no preparation pertaining exclusively to the penalty phase of trial was undertaken by Zeitz or his investigator Russell Kolins.[13] Zeitz testified both that, over the course of that year, Marshall became an increasingly difficult client to control (he had, from the start been a client who was adamant about charting his own defense), and the community, perhaps even his sons, had progressively turned against Marshall, disbelieving his protestations of innocence. But neither circumstance excuses counsel's failure to conduct any investigation into possible mitigating factors or prepare a case for life. *See United States v. Gray*, 878 F.2d 702 (3d Cir. 1989) ("[Defendant's] reluctance to subpoena witnesses . . . did

---

[13]According to Zeitz, "[Kolins] knew based on our prior experience that his responsibilities included not only [going to Louisiana to gather information about McKinnon], but if he found something at any point in time that could relate to either part of the case, [guilt or penalty phase,] that was his job." (A278.)

35

not absolve [his counsel] of his independent professional responsibility to investigate what information . . . potential witnesses possessed."); *Dobbs*, 142 F.3d at 1388 (stating that lawyers may not "blindly follow" a client's commands without independently evaluating potential avenues and properly advising the client).

Although recognizing the fact that Marshall was tried almost twenty years ago, even then Zeitz well knew that "the unique nature of modern capital sentencing proceedings . . . derives from the fundamental principle that death is different." *Schiro v. Farley*, 510 U.S. 222, 238, 114 S. Ct. 783, 127 L. Ed. 2d 47 (1994) (citations omitted). Widely accepted national guidelines, state specific standards, and Zeitz's own testimony regarding his previous capital experience – all of which aid in our evaluation of the reasonableness of Zeitz's preparation – make clear that Zeitz understood but abdicated his responsibility as counsel to a client facing a possible death sentence.

First, in 1986, among the "prevailing professional norms" set forth in the ABA Standards for Criminal Justice, a source recommended as a useful guide by the Supreme Court in *Strickland*, 466 U.S. at 688-89, and, more recently, *Rompilla,* 125 S. Ct. at 2466 ("We long have referred to these ABA Standards as 'guides to determining what is reasonable.'") (quoting *Wiggins*, 539 U.S. at 524), was the following relevant Standard:

> It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits

36

of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty.

Standard for Criminal Justice, 4-4.1 (2d ed. 1982 Supp.). The District Court found that this ABA provision, "coupled with *Strickland*'s explicit language requiring a thorough investigation into facts relevant to both guilt and sentencing clearly show that a separate penalty phase investigation was the very foundation of reasonable representation in 1986." 313 F. Supp. 2d at 441. We agree. As we opined in *Marshall V*:

The existence of a penalty phase in capital trials makes such trials radically different from ordinary criminal trials. A full capital trial is in fact two separate but intimately related trials: a preliminary guilt trial focusing on issues pertaining to the commission of a capital offense, and a subsequent penalty trial about the convicted defendant's worthiness to live. The guilt trial establishes the elements of the capital crime. The penalty trial is a trial for life. It is a trial for life in the sense that the defendant's life is at stake, and it is a trial about life, because a central issue is the meaning and value of the defendant's life.

37

307 F.3d at 99 (quoting Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. Rev. 299, 303 (1983)). "The penalty phase focuses not on absolving the defendant from guilt, but rather on the production of evidence to make the case for life. The purpose of the investigation is to find witnesses *to help humanize* the defendant, given that the jury has found him guilty of a capital offense." *Id.* at 103 (emphasis in original). The latter point bears emphasis: by all accounts, Zeitz seems not to grasp that, whatever his strategy was in terms of humanizing Marshall during the trial itself, it was unreasonable for him to have placed so much stock in that evidence *once the jury rendered its verdict*. Zeitz maintains that "the guilt phase of the case has to be looked at to understand what we did in the penalty phase [because] if you just look at the penalty phase in a vacuum, it looks like there was nothing that was done, no strategy, et cetera, but that wasn't the case." (Test. of Glenn Zeitz at A143.) But, as summarized in the excerpt above, the penalty phase is a different animal, where the stakes are completely different from those encountered in the guilt phase. With the outright rejection of Marshall's defense, which is the only way the guilty verdict can be interpreted, Zeitz knew that the jury also had rejected the character evidence submitted in support of that defense. Indeed, it would only be fair to assume that they had found Marshall to be a liar and a despicable person for paying someone to have his wife killed. Zeitz's clear duty at that point was to shift his focus away from absolving Marshall of involvement in his wife's murder – certainly, the evidence for the guilt phase had not worked for that purpose – to saving his life. While counsel can harken back to evidence from the guilt phase during the penalty phase, here, Zeitz failed to allude to any of what he thought to

38

be compelling character testimony from the guilt phase. He seemed to assume the jury would consider it anew during the penalty phase. We can only reason that Zeitz *hoped* this would suffice for the simple reason that he had no additional evidence or witnesses, and, he had none because he failed to prepare any witnesses or conduct any investigation into potential penalty phase mitigating evidence or testimony. This omission flies in the face of the "prevailing professional norms" in 1986, which were well-established not only by national ABA standards but in the relevant jurisdiction, as well.

As detailed by the District Court, actual courtroom practice of capital defenders in New Jersey in 1986 reflected an understanding of the obligation to investigate and prepare a case for life. Between 1982, the year the New Jersey state legislature reinstated the death penalty in New Jersey after a ten year hiatus, *see* N.J. Stat. Ann. § 2C:11-3 (West 1982), and the time of Marshall's trial in 1986, there were 55 capital cases tried in New Jersey state court. In each and every one of those cases, counsel presented at least some type of penalty phase mitigation evidence, demonstrating some sort of underlying penalty phase preparation. In 51 of those cases, counsel called at least one witness on behalf of the defendant, and in 47 of those cases called at least one family member. *Marshall VI*, 313 F. Supp. 2d at 441. As explained by Petitioner's expert at the evidentiary hearing before the District Court, this makes sense because the "penalty phase is more about emotions than fact." (Test. of Carl Herman at A875.)

As noted above, the District Court details in its opinion more than a dozen witnesses who would have testified on

39

Marshall's behalf during the penalty phase of the trial. We agree with the District Court that the mere fact of people willing to testify on Marshall's behalf does not demand a finding of ineffectiveness, but it is Zeitz's failure to have discovered and/or spoken to those people in preparation for the penalty phase that constitutes fundamentally inadequate representation. Testimony offered by the State's own expert confirms this view:

> THE COURT: [W]ould you agree that unless [Zeitz has] made an adequate investigation, he's not in a position to determine what he should put on and what he should not put on?
>
> GRAVES: Well, that the – the U.S. Supreme Court has said that, so absolutely.

(Test. of William Graves at A1197.) In other words, the "right to present, and to have the sentencer consider, any and all mitigating evidence means little if defense counsel fails to look for mitigating evidence." *Strickland*, 466 U.S. at 706 (Brennan, J., concurring in part and dissenting in part) (internal citations omitted).

Zeitz's own testimony confirms that he was not ignorant of his obligations as counsel to a capital defendant:

> PETITIONER'S COUNSEL: What was your understanding of the role of the capital defense lawyer at the time [you represented Marshall], is it your understanding that your obligation was to prepare and presumably present a case in mitigation of punishment,

40

notwithstanding your client's wishes?

ZEITZ: Yes, you are – your job ...

PETITIONER'S COUNSEL: Okay.

ZEITZ: Your job is to present a case for life.

(Test. of Glenn Zeitz at A132.)   But yet Zeitz had not prepared and thus presented no such case, instead choosing to rest on evidence submitted at trial and obviously, or at least ostensibly, rejected by the jury charged with deciding Marshall's fate. Again, Zeitz has claimed that he was abiding by his client's wishes; however, he testified clearly before the District Court that he knew of his obligation to put on a case in mitigation notwithstanding Marshall's wishes:

> THE COURT: [E]ven if a client says I want to get a death sentence, you would have an obligation to do that ...
>
> ZEITZ: Yes, that's your ethical obligation.

(*Id.* at A135.)  Yet Zeitz testified clearly that he had nothing and no one prepared for a penalty phase hearing.

> RESPONDENTS' COUNSEL: So, my question was then he was convicted on March 5th, 1986, did you have any documents, discovery of any kind, that you were considering to turn over as part of what you were going to present in the penalty phase?

41

ZEITZ: No.

***

RESPONDENTS' COUNSEL: [D]id you have any other witnesses lined up as potential mitigation witnesses for the penalty phase, prior to reaching this agreement about not calling witnesses?

ZEITZ: No.

(*Id.* at A144-146.)

Perhaps the most glaring of Zeitz's omissions, and what strongly contributes to our rendering the state court's application of *Strickland* to this case "unreasonable," was the failure to interview Marshall's sons, with respect to the penalty phase specifically. Concerning the impact of mitigation witnesses during the penalty phase generally, Petitioner's expert Carl Herman testified:

> Typically what you get are family members, you know, brothers, sisters, children, in the most horrible cases who get on the stand and ... say to the jury, I know that you found my brother, my father, guilty of this crime [and] he's going to have to pay for that for the rest of his life, but he's my father and I love him, and I'm going to visit him in jail, please don't execute him; he can do some good; I need him as a father. It could be two minutes of testimony. [B]ut frequently it's very moving, very emotional.

42

(Test. of Carl Herman at A875.) Regarding the instant case, the State's own expert testified before the District Court without ambiguity: "I think he should have interviewed all three of the children." (Test. of William Graves at A1194.) But, as Marshall's youngest son John testified, at no time leading up to or during the trial did Zeitz speak to him about what a penalty phase was or what would happen if his father was found guilty. When asked by Petitioner's counsel, "At any point did you have an understanding . . . [w]hat would happen in the event your father was found guilty?" John Marshall responded, "No, I didn't." (Test. of John Marshall at A379.) Had Zeitz interviewed Marshall's sons he would have discovered, according to John Marshall's testimony, that each of the boys would have willingly taken the stand and pleaded for the jury to spare his father's life.

> PETITIONER'S COUNSEL: Assuming that you had been asked to [testify] after your father had been found guilty, would you have been willing to do so back in 1986?
>
> JOHN MARSHALL: Most definitely.
>
> PETITIONER'S COUNSEL: And that would have involved the willingness on your part to ask the jury to spare your father's life?
>
> JOHN MARSHALL: Yes, it would have.
>
> PETITIONER'S COUNSEL: How about your brothers, do you believe that your brothers would have been – let's

43

start with Chris first. (A: Okay.) Would he have been willing to testify?

JOHN MARSHALL: Most definitely, yes.

PETITIONER'S COUNSEL: And how about Rob?

JOHN MARSHALL: Yes, most definitely.

\*\*\*

PETITIONER'S COUNSEL: Is there any doubt in your mind that both of your brothers would have been willing to testify in front of the jury back in 1986, and ask the jurors to spare your father's life?

JOHN MARSHALL: There is no doubt in my mind.

(*Id.* at A381-383.)  Zeitz also would have discovered that not only were Marshall's boys willing to testify, but that the sort of things to which they were prepared to testify could have served as powerful mitigation evidence.

PETITIONER'S COUNSEL: [W]hat would you have wanted the jury to know about your father and your relationship with him before they decided whether he should be put to death?

JOHN MARSHALL: I think I would have told them that my father was a loving father, and devoted to my brothers and I; and he was at every swim meet of ours, at

44

every baseball game that I had, every soccer match that I had; went back to school at nights; playing catch out in the driveway; you know, took us skiing, took us ice boating. He was a very devoted and loving father and still is to this day.

\*\*\*

PETITIONER'S COUNSEL: Now obviously by that point, had you been asked [to testify], you would have been in a position of your father [having] been found guilty of the killing of your mom. How does that figure into your wanting – you would have wanted the jury not to go for the death penalty for your dad?

JOHN MARSHALL: Again, it was one of the hardest things to go through losing a mother at that age, especially in that manner. And I just – I just don't understand to this day why the State of New Jersey would want to take my father away from me.

(*Id.* at A384-386.) Zeitz testified that it was his "belief" that Christopher Marshall would not plead for his father's life if called during the penalty phase. He added that he felt that same way about Robbie Marshall. Zeitz's beliefs stemmed from conversations, he testified, that he had had with Robert Marshall. But counsel's "beliefs" are not a substitute for informed strategy, and even if Zeitz's intuitions had proved correct at the time, his failure to at least approach Marshall's sons to ask what they might say belies comprehension and renders nugatory any purported strategy on his part.

45

The Supreme Court repeatedly has emphasized that a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. It is for this reason that courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (citation omitted). While these precepts wisely caution against relying too heavily on the clarity often afforded by hindsight, such a concern is absent here. In this case, retrospect affords us the *only* view of what might have been, since Zeitz did nothing at the time; in other words, we are not looking back to evaluate whether Zeitz might have altered in some nuanced way his strategy concerning the Marshall boys but, rather, we are searching for some plausible reason for why he employed no strategy at all. We can find none. Furthermore, as powerful as Zeitz viewed the sons' testimony during the trial to have been, the substance of that testimony gave no clue as to the sons' feelings for their father. It was used instead to establish Marshall's state of mind at the time he placed the phone calls from the hotel. *See supra* note 6. Surely the jury was left wondering why the sons would not have pled for their father's life and could have reasonably drawn a negative inference from their absence from the courtroom during the penalty phase, as well.

To be clear, this is not a case that calls upon us to define the contours of the "few hard edged rules" spawned by

46

evaluations of counsel's effectiveness. *Rompilla*, 125 S. Ct. at 2462 (noting that the merits of counsel's choices in that case were subject to debate). The Court in *Rompilla* took pains to distinguish the case with which it was presented, where counsel pursued several leads to gather mitigation material but failed to examine a single crucial file, *id.* at 2463-64, from a case such as Marshall's "in which defense counsel simply ignored [his] obligation to find mitigating evidence," *id.* at 2462. *See also White v. Singletary*, 972 F.2d 1218, 1224 (11th Cir. 1992) (stating that "it should be beyond cavil that an attorney who fails altogether to make any preparations for the penalty phase of a capital murder trial deprives his client of reasonably effective assistance of counsel by any objective standard of reasonableness").

In addition, we view the "agreement" that Zeitz struck with the prosecutor as additional evidence of the abdication of his role. Zeitz did not so much agree to a non-adversarial penalty phase, as he brought it on himself as a result of his own failure to have prepared for that phase of trial. Zeitz was not merely agreeing to hold back on the production of evidence – he had no evidence to introduce. Whether or not the prosecution consented to the "agreement," Zeitz had no witnesses or evidence of any kind prepared to present in mitigation to the jury. Far from a strategic, bargained-for exchange, the agreement appears to have been the only option. Although Zeitz had, in the time leading up to the commencement of the trial, hired investigator Kolins to assist in gathering information relevant to Marshall's case, again, Zeitz testified that at no time did either he or Kolins engage in pointed discussions with individual family members, friends, neighbors, or business

47

associates to determine whether those individuals would be willing to testify at a penalty phase and, if so, what they might say if called to testify. Agreement or not, Zeitz simply had no penalty phase evidence to present.

As discussed throughout, Zeitz's lack of preparation for the penalty phase is all the more incredible in light of his knowledge from the inception that the case would be a capital one and that his client faced powerful State's evidence.

> PETITIONER'S COUNSEL: My question is, do you agree with the proposition that where your assessment as a capital defense attorney is that the proof of guilt is overwhelming, would you agree with the proposition that that simply highlights or underscores the need for exhaustive preparation for the penalty phase? Do you agree with that?

> ZEITZ: I'm saying to you the following – I don't disagree with the proposition.

(Test. of Glenn Zeitz at A447.) Because we affirmatively *agree* with the proposition offered by Petitioner's counsel, we must find that under the prevailing professional norms applicable in 1986, Zeitz's representation, insofar as his failure to investigate or prepare a case for life, was objectively unreasonable.

As to whether Marshall suffered prejudice as a result of Zeitz's actions or inactions, which we must determine under *Strickland*, we explained in *Marshall V* that the prejudice prong is particularly subtle in a "weighing" state like New Jersey:

48

"Given the unanimity requirement, the 'reasonable probability of a different outcome' would mean that only one juror need weigh the factors differently and find that the aggravating factor did not outweigh the two mitigating factors." 307 F.3d at 103. In other words, "even if the aggravating and mitigating factors were of equal weight, under New Jersey's sentencing scheme, the sentence would be life in prison, not death." *Id.* at 103-04. The New Jersey Supreme Court has thus emphasized, "The importance of the jury's determination cannot be overstated, as the entire system of capital punishment depends on the belief that a jury representing the conscience of the community will responsibly exercise its guided discretion in deciding who shall live and who shall die." *State v. Koskovich*, 168 N.J. 448, 776 A.2d 144, 192 (2001) (internal citations omitted). We found in *Marshall V* that:

> Zeitz did not mention, let alone focus on, the intricacies of the weighing process the jury must go through in considering the various factors, telling the jurors instead that the death penalty can be imposed "if all twelve of you agree to do it unanimously." His last words were not a plea for mercy, but, rather, more akin to a verbal shrug of the shoulders: "whatever you feel is the just thing to do, we can live with it."

307 F.3d at 101. Based on the state court record before us at the time, we determined that it was "impossible for us to conclude that there is not a reasonable probability that the outcome would have been different had counsel done what Marshall urges he should have done." *Id.* at 107. However, given the unknowns at the time of our previous decision, we also were unable to

49

conclude that Marshall had indeed suffered prejudice as a result of Zeitz's then-alleged ineffectiveness. *Id.* We now have the benefit of copious testimony adduced at the evidentiary hearing as well as the District Court's comprehensive analysis of the issues.

Looking at Zeitz's appeal to the jury, one would think that the only two mitigating aspects worthy of consideration by the jury were the two he briefly mentioned – the fact that Marshall was a law abiding citizen, and that he had no significant history of prior criminal activity. But that is not the case. The "catch all" provision of the death penalty statute – which empowers the jury to consider "*[a]ny other factor* which is relevant to the defendant's character or record or to the circumstances of the offense," N.J. Stat. Ann. § 2C:11-3(c)(5)(h) – is an invitation, and an opportunity, to offer other reasons why life should be spared. Those other reasons were in the minds and voices of the witnesses not interviewed and thus never called, including Marshall's sons. Absent those witnesses, Zeitz had no choice but to argue only those relatively insignificant aspects – essentially applicable to any and every first time offender of a brutal crime – that are anything but "humanizing." And, while the judge no doubt instructed as to the "catch-all" factor, if Zeitz could not even suggest to the jury what those other relevant factors might be, how are the members of the jury to know why they should spare Marshall's life? Zeitz's attempt to point to certain other things – passing references to civic endeavors and attendance at swim meets – without people to vouch for these things as a reason to vote for life, seemed more de-humanizing than humanizing. While the jury did find the "catch-all" mitigating factor to be present, the

50

finding alone is meaningless; it is the "weight" attributed to the factor that is significant. And that weight was clearly affected by the bland emotionless argument and lack of evidence offered by Zeitz.

*Strickland* admonishes us to focus on "on the fundamental fairness of the proceeding whose result is being challenged" and on whether "the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." 466 U.S. at 696. In this case, the District Court had "no confidence that the penalty phase of Marshall's trial was a genuine adversarial proceeding." 313 F. Supp. 2d at 457. By virtue of the evidentiary hearing, Marshall was able to confirm his allegations of ineffectiveness and establish the reasonable probability that the outcome of the penalty phase of his trial would have been different. *See Strickland*, 466 U.S. at 697. We are confident that Zeitz's numerous failures in investigating and preparing for the penalty phase of the case, and in putting on and arguing a case for life, prejudiced Marshall. He has thereby satisfied the *Strickland* test. The state court's denial of relief to Marshall based on Zeitz's ineffective assistance during the penalty phase was an "unreasonable application" of this clearly established Supreme Court law and thus Marshall is entitled to relief under the AEDPA. *Williams*, 529 U.S. at 379.

## V. Conclusion

For the reasons set forth above, we find that the New

51

Jersey Supreme Court's decision "involved an unreasonable application" of the principles announced in *Strickland*, and Marshall is entitled to habeas relief under § 2254(d)(1). We will therefore AFFIRM the District Court's Order in all respects. New Jersey must either retry the case on penalty within 120 days or stipulate to a life sentence.