NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 08-4303
_____

TIMOTHY HANSON,
Appellant

v.

SUPERINTENDENT MARTIN L. DRAGOVICH; *TOM CORBETT,
ATTORNEY GENERAL OF PENNSYLVANIA
*(Pursuant to Rule 43(c), F. R. A. P.)
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN
DISTRICT OF PENNSYLVANIA
(D.C. Civ. Action No. 02-cv-00069)
District Judge: Honorable Kim R. Gibson
_____

Argued on October 20, 2010
_____

Before: HARDIMAN, GREENAWAY, JR., and NYGAARD, Circuit Judges

(Opinion Filed: February 1, 2011)

Bruce A. Antokwiak, Esquire (argued)
Duquesne University School of Law
600 Forbes Avenue
Pittsburgh, PA 15282
         *Counsel for Appellant*

Trudy G. Lumadue, Esquire (argued)
Office of District Attorney
230 East Market Street
Clearfield, PA 16830
         *Counsel for Appellees*

1

_____

OPINION

_____

GREENAWAY, JR., Circuit Judge

Timothy Hanson ("Tim") appeals the Memorandum Order of the United States District Court for the Western District of Pennsylvania adopting the Magistrate Judge's Report and Recommendation ("R&R") and ordering that Tim's petition seeking the issuance of a writ of habeas corpus be denied. The Court determined that Tim was not denied effective assistance of counsel. Tim argues that the Court's determination was based on an unreasonable application of the law and on an unreasonable determination of the facts in evidence. For the following reasons, we will affirm.

## I.  BACKGROUND

We write solely for the benefit of the parties and recount only the essential facts.

On the afternoon of December 24, 1987, Tim (then fifteen years old), his older brother, Tom Hanson ("Tom") (then twenty years old), and Tom's girlfriend, Betty Jo Wootan[1] ("Betty Jo") (then sixteen years old), were at the Hanson family's house. David Smith, Tom's friend, came to the front door of the house as Tim, Tom, and Betty Jo sat in the living room. David was told to go to the back door, by the kitchen, because the front door was stuck. When David went to the kitchen and walked into the house, he was shot and killed by a single gunshot from a shotgun that Tom owned. Tim, Tom, and Betty Jo

_____

[1] As a result of a plea bargain that dismissed charges of interference with the custody of children and corruption of minors, Tom had pled guilty to, and was on probation for, disorderly conduct.

left the house and walked or ran back and forth between the woods and the house several times. Other Hanson family members arrived at the house shortly after the shooting and contacted local authorities. Helen, a sibling of Tim and Tom, also came to the Hanson house. Betty Jo left the scene through the woods and did not return that day. Pennsylvania State Troopers arrived and Tom and Tim came out of the woods and met with the troopers.

After being advised of his <u>Miranda</u> rights, Tim told a trooper that he had been trying to fix the shotgun when it fired accidentally. Tim did not agree to have his hands tested to determine whether he had fired a gun recently. Tom told the troopers that Tim shot David and he allowed testing of his hands to determine whether he had fired a gun recently. The test indicated that the levels of chemicals present on his hands were insignificant. Tom also had a burn or mark on the right side of his face that, at trial, the Commonwealth argued was the result of Tom's proximity to Tim's gunshot blast.

Tim was arrested that same day, December 24, 1987, and charged with criminal homicide, in violation of 18 Pa. C.S. § 2501A. F. Cortez Bell and Christopher Shaw of the Clearfield County public defender's office were appointed to represent Tim. Judge John K. Reilly, Jr. denied counsel's motion to certify Tim as a juvenile. He was tried as an adult.

Tom and Betty Jo testified at trial that Tom opened the back door for David and that Tim loaded Tom's shotgun, then went into the kitchen, and fired a single shot past Tom and at David, killing David. Tom and Betty Jo also testified that Tim took David's glasses and ran into the woods. Tom and Betty Jo said they chased Tim after he ran into

3

the woods and they tried to convince Tim to go back to the house and report the matter. They testified that Tim told Helen he would pay her if she drove him to Florida. Tom and Betty Jo said that they did not know why Tim shot David.

At trial, Tim told his counsel, and testified to, a different account of the events than the one he had told the troopers the day of the shooting — he now said that Tom had accidentally shot David during a prank.[2] Tim stated that, when David arrived, Tim went with Tom and Betty Jo into the bedroom and they saw, through the bedroom window, that David was at the door. According to Tim, Tom suggested they play "a little joke" on David — that Tom would scare him with the shotgun. Tim testified that he opened the door for David and Tom came into the kitchen with the shotgun. Although Tom intended to scare David as a prank, Tim stated that he thought the shotgun "went off" accidentally. (App. at 611a.) Tim testified that, on the walks into the woods after the shooting, Tom had convinced him to take responsibility for the shooting because, as a juvenile, Tim would be treated more leniently. Tim said he had lied to the troopers on the day David was killed when he said the gun went off accidentally as he was cleaning it.

---

[2] During cross-examination at trial, Tim testified that he first told defense attorneys this new account during the second day of trial. (App. at 638a; 642a; 647a–48a.) Defense counsel repeatedly tried to help Tim remember that he told them on the first day of trial. (App. at 647a–48a.) Defense counsel also cross-examined Tom on the first day of trial in a manner indicating that the theory of the case at that time was consistent with Tim's new account. (App. at 171a (defense counsel asked Tom if he had "fired that gun," if he was sure he "didn't tell Tim to take the rap" because Tim was a juvenile).) Tim now claims that he was confused about the days and that he told his trial counsel the account of events that he testified to before any testimony began on the first day of trial. (Appellant's Br. 52–53.)

Janet Lindberg, Tim's sister, and Bertha Hanson, Tim's mother, testified that they heard Tom tell Betty Jo, "if I go down, you're going down, too, Bitch." (App. at 653a; 659a.) Tim's mother also testified that, on the night of the shooting, Tom told her that he, not Tim, had shot David.

The jury returned a verdict of murder in the first degree. On January 17, 1989, Tim received a sentence of life imprisonment without the possibility of parole.

In 1993, after his appeal was dismissed because his court-appointed attorneys had failed to make the necessary filings, Tim filed a pro se Post Conviction Relief Act ("PCRA") petition to have his appellate rights reinstated. An evidentiary hearing was held and Tim's PCRA petition was granted — his appellate rights were reinstated. On November 18, 1999, the Court of Common Pleas of Clearfield County, Pennsylvania issued an Opinion and Order dismissing Tim's petition under the PCRA and denying all relief.

Pursuant to 28 U.S.C. § 2254, Tim filed a timely, counseled habeas corpus petition to the United States District Court on February 25, 2002. Magistrate Judge Keith A. Pesto was assigned the matter and issued his R&R denying the habeas petition on September 12, 2008 — more than six years after the petition was filed.[3] Tim's objections to the R&R were summarily denied by the District Court. Further, the District Court denied Tim's Certificate of Appealability ("COA") on September 29, 2008.

Although Tim sought relief on a number of grounds related to ineffective

---

[3] We are aware of no justification for the shocking delay of over six years between the filing of the habeas corpus petition and the issuance of the Magistrate Judge's R&R.

assistance of counsel, we granted a COA only on the claims arising from: defense counsel soliciting, and failing to object to, Trooper Brown's testimony regarding Tim's invocation of his rights to silence and counsel; defense counsel stipulating to evidence regarding Tim's juvenile proceedings; defense counsel soliciting testimony from David's girlfriend, Sara Brant; and defense counsel failing to object to testimony of David's mom, Linda Pollard. We denied the request for a COA on all other issues presented in the request.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court exercised jurisdiction over Tim's petition seeking the issuance of a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. We have jurisdiction to review the District Court's denial of the writ, pursuant to 28 U.S.C. § 2253.[4]

When reviewing a district court decision regarding a petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254, we must "apply the same standards as the District Court, as mandated by the Antiterrorism and Effective Death Penalty Act of 1996" ("AEDPA"). Jacobs v. Horn, 395 F.3d 92, 99 (3d Cir. 2005). Section 2254(d) provides that, where, as here, a habeas petitioner's claim was adjudicated on the merits in a state court proceeding, a federal court may grant a habeas corpus petition only if the petitioner establishes that the state court proceedings:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or

---

[4] Although Appellant presents arguments regarding his trial counsel's failure to object to cross-examination questions asked of Tim, our limited COA does not include this issue.

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). We must presume that the state court's findings of fact are correct unless the findings are not fairly supported by the record or the petitioner rebuts the presumption of correctness with clear and convincing evidence. Jacobs, 395 F.3d at 99 (citing 28 U.S.C. § 2254 (e)(1)); Meyers v. Gillis, 142 F.3d 664, 667 (3d Cir. 1998).

A state court decision is contrary to clearly established federal law if it reaches a "'conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'" Marshall v. Hendricks, 307 F.3d 36, 51 (3d Cir. 2002) (quoting Williams v. Taylor, 529 U.S. 362, 413 (2000)). A state court decision is an unreasonable application of clearly established federal law if the court "identifies the correct governing legal rule from the Supreme Court's cases but unreasonably applies it to the facts of the particular case," "unreasonably extends a legal principle from the Supreme Court's precedent to a new context where it should not apply," or "unreasonably refuses to extend that principle to a new context where it should apply." Gattis v. Snyder, 278 F.3d 222, 228 (3d Cir. 2002) (citing Williams, 529 U.S. at 407). "To find a state court's application of Supreme Court precedent 'unreasonable,' the state court decision must be 'more than incorrect or erroneous'; it must have been 'objectively unreasonable.'" Marshall v. Cathel, 428 F.3d 452, 462 (3d Cir. 2005) (quoting Wiggins v. Smith, 539 U.S. 510, 520 (2003)).

7

## III. ANALYSIS

For AEDPA purposes, the clearly established federal law for ineffective assistance of counsel claims is the two-prong test in Strickland v. Washington, 466 U.S. 668, 687 (1984).

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id.[5]

To establish deficiency in counsel performance, a defendant must show that counsel's performance "fell below an objective standard of reasonableness." Id. at 688. Our scrutiny of counsel's performance must be highly deferential and we must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689. There is a strong presumption that counsel's performance is within the wide range of reasonable assistance and the defendant must overcome the assumption that the challenged action might be sound trial strategy. Id.

---

[5] Our analysis of the deficiency and prejudice prongs does not have to proceed in any specific order; it is likely often "easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice." Strickland, 466 U.S. at 697.

To show prejudice, a defendant must demonstrate that the act or omission "actually had an adverse effect on the defense." Id. at 693. According to Strickland,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Id. at 694. We must consider the totality of the evidence because "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Id. at 696.

Showing that counsel's performance was deficient "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687 (emphasis added). Thus, deficiency may be assessed by considering multiple alleged errors together, rather than requiring that any single error render counsel ineffective. Similarly, showing that the deficient performance prejudiced the defendant "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial." Id. (emphasis added). This language implies that, while each alleged error may not individually be prejudicial to the defense, the errors may be prejudicial when combined. Id.

Our standard of review is "doubly deferential" because both AEDPA and Strickland are highly deferential standards. Knowles v. Mirzayance, --- U.S. ----, ----, 129 S. Ct. 1411, 1420 (2009).

To evaluate whether the Pennsylvania Superior Court's rejection of Tim's claim either is contrary to, or involved an objectively unreasonable application of, Strickland,

9

we begin by determining whether the standard employed by the state court is "contrary to," or contradicted by, Strickland. The Superior Court's test presumes that trial counsel was effective and, to rebut that presumption, the petitioner must show:

> (1) that the claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and, (3) that, but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different.

(App. at 1163a (citing Commonwealth v. Kimball, 724 A.2d 326, 333 (Pa. 1999)).) The Superior Court's presumption is the same as the presumption in Strickland and the Superior Court divides Strickland's two prongs into three prongs. Thus, the Superior Court's standard is substantively identical to Strickland and is not contrary to Strickland. See Werts v. Vaughn, 228 F.3d 178, 202–04 (3d Cir. 2000) (holding that a Pennsylvania state court applying the Pennsylvania ineffective assistance of counsel standard did not contradict Strickland).

Next, we determine whether the Superior Court's application of the law was "objectively unreasonable." Wiggins, 539 U.S. at 520.

## A. Invocation of rights to silence and counsel

Tim claims ineffective assistance of counsel occurred during testimony regarding his invocation of his rights to silence and counsel. At trial, after Trooper Brown ("Brown") explained that he had tested Tom's hands for gunshot residue on the day of the shooting, the Commonwealth asked why Tim's hands were not tested for gunshot residue. Brown responded, "he said that he wasn't going to permit it, to say anything to us, and he requested his attorney." (App. at 552a.) Defense counsel did not object and

direct examination of Brown ended soon after Brown gave this testimony. On cross-examination of Brown, defense counsel stated, "[i]n relationship to what you just said, it sounds to me like Mr. Hanson exercised his <u>Miranda</u> rights, for his right to speak to an attorney before talking to you, et cetera; is that right?" (App. at 553a.) Tim claims that his counsel was ineffective when neither of them objected to the Commonwealth's questions and when defense counsel mentioned Tim's invocation of his <u>Miranda</u> rights.

### 1. Refusing the gunshot residue test

The court was not objectively unreasonable in concluding that defense counsel's failure to object during Brown's testimony was not an error so serious as to render counsel's performance deficient. The trooper testified that Tim did not have his hands tested because "he said he wasn't going to permit it." (App. at 552a.) Under Supreme Court and Pennsylvania precedent, the testimony that Tim did not permit a gunshot residue test does not implicate Tim's right to silence because the admission into evidence of a defendant's refusal to submit to a physical test does not offend the right against self-incrimination under the Fifth Amendment. <u>See</u> <u>South Dakota v. Neville</u>, 459 U.S. 553, 564 (1983); <u>Commonwealth v. Monahan</u>, 549 A.2d 231, 235–36 (Pa. 1988).

### 2. Invoking right to silence

After being asked why the gunshot residue test was not conducted on Tim's hands, Brown answered that Tim said "he wasn't going to . . . say anything to us, and he requested his attorney." (App. at 552a.) Because Brown's statement was an unsolicited passing reference to Tim's invocation of his rights, the Commonwealth's question is not inherently objectionable. Even if counsel was deficient in not objecting and not moving

for a mistrial, the Superior Court's finding that this testimony did not result in actual prejudice is not objectively unreasonable.

Shortl y before invoking his rights to silence and to an attorney, Tim confessed to troopers that he was holding the shotgun when it went off. Because Tim had already confessed, the jury would have no reason to assume Tim's silence demonstrated guilt. The abundance of other evidence of Tim's guilt, including Tom's and Betty Jo's testimony, Tim's initial statement to the troopers, and the results of Tom's gunshot residue test, make it reasonable to conclude that the outcome of the trial would have been the same even without this alleged error. Thus, the court was not objectively unreasonable by concluding that the prejudice prong was not met.

Additionally, the court was not objectively unreasonable in finding that defense counsel's performance was not deficient when counsel referenced and solicited testimony regarding Tim's invocation of his right to remain silent. On cross-examination of a witness who referred to Tim's invocation of his rights to silence and counsel, Tim's counsel said, in part, "it sounds to me like Mr. Hanson exercised his <u>Miranda</u> rights, or his right to speak to an attorney before talking to you, et cetera; is that right?" (App. at 553a.) Trial counsel stated that he referred to Tim's invocation of his rights "to convey that [Tim] exercising his constitutional rights was a proper and common thing to do" "in an effort to minimize any negative inference." (App. at 1152a.)

After Trooper Brown responded to the question, defense counsel asked, "[h]ad Corporal Wrable already spoken to [Tim], however, if you know, prior to your arrival?" (App. at 553a.) This second cross-examination question shows the broader context of the

12

question regarding Tim's invocation of his <u>Miranda</u> rights. Defense counsel was likely trying to emphasize that Tim had already been cooperative and made a statement to the troopers prior to invoking his right to silence. Moreover, it is reasonable for a court to conclude that the statements on direct examination regarding Tim's invocation were unsolicited passing references. On these facts, a court could reasonably conclude that Tim's defense counsel's reference to the invocation could be a strategic choice that fell within the wide range of reasonable and effective assistance of counsel.

Because the court was not objectively unreasonable in finding that Tim did not establish error regarding his counsel's reference to his invocation, we need not reach the issue of prejudice.

**B.      Stipulation to evidence regarding Tim's juvenile proceedings[6]**

During Tom's testimony at trial, Tom testified that, before the shooting, he was talking to Tim about "turning himself in" to "the law." (App. at 76a.) Defense counsel made no objection. Next, the Commonwealth asked why Tim and Tom were discussing Tim turning himself in. Defense counsel objected.[7] The Commonwealth asked no further questions about Tim's juvenile proceedings during Tom's testimony.

Later on during the trial, defense counsel stipulated to reading certain statements that specific state troopers would have testified to and introduced into evidence, had they indeed testified. Specifically, defense counsel stipulated to testimony that would have

---

[6] Although both Appellant and Appellees refer to this issue as a stipulation to admit Tim's "juvenile record," there was no juvenile record admitted into evidence under this stipulation.

[7] There is a dispute regarding whether the objection was overruled or sustained, which we need not resolve now.

been given by Sergeant Smeal — that visitation records at the Clearfield County Jail indicated that Helen Gallaher, Tim's sister, visited Tim at the jail six times from 1987 to 1988.  Defense counsel also stipulated to testimony that would have been given by Trooper Zimmerman — that he had gone to the Hanson home twice in December 1987, looking for Tim because Tim, on December 2, 1987, had left a juvenile facility where he had been placed the previous day by court order as a result of a separate juvenile charge that was irrelevant to the instant case.[8]

Appellant claims that defense counsel stipulating to these statements regarding Tim's juvenile proceedings was deficient performance of counsel that prejudiced the defense even though Tom had already testified without objection, prior to the stipulation, regarding Tim potentially turning himself in to the law.  Appellant's COA did not claim ineffective assistance of counsel due to defense counsel's failure to object to Tom's first reference to Tim turning himself in to the law.

The Superior Court was not objectively unreasonable in concluding that entering into this stipulation was not deficient performance.  Prior to the stipulation, the court had allowed testimony regarding Tim running from the house after the shooting, pursuant to Pennsylvania Rule of Evidence 404(b), and the court had informed the jury that Tim's flight could be evidence of his consciousness of guilt.  The court found that defense

---

[8] Defense counsel stipulated to testimony that would have been given by other troopers, but this other evidence is not related to Tim's juvenile proceedings and is not at issue on appeal.  Defense counsel stipulated that Trooper Davidson would testify that he had been to the Hanson home twenty-three times during 1987  because he was looking for Carl Hanson, Jr., Tim's brother, on unrelated charges and that Trooper Davidson usually heard voices coming from inside the home, but nobody would answer the door for him.

counsel entering into the stipulation was a strategic choice to explain that Tim went into the woods after the shooting, not because he was the shooter, but because he did not want to be detained due to his juvenile proceedings.

Tim asserts that defense counsel objecting to the questions regarding his juvenile proceedings during Tom's testimony demonstrates that stipulating to the admission of similar testimony later was ineffective assistance of counsel. The Magistrate Judge opined that this shift in strategy could be explained by defense counsel not learning of Tom's new account of events until the second day of trial, which was after Tom's testimony. Even though Tim's counsel was aware of his new description of the shooting shortly before Tom testified on the first day of trial, defense counsel might not have had sufficient time to develop, or act according to, the new theory of the case during Tom's testimony.

Alternatively, defense counsel could have made a strategic decision to object to Tom's testimony while later stipulating to testimony regarding similar topics.[9] Tim's counsel could have stipulated to the additional information as part of a strategic decision because Tom's testimony that he talked to Tim about Tim "turning himself in" to "the law" was already in evidence and because it is likely that the evidence in the stipulation would have been admitted under Pennsylvania Rule of Evidence 404(b). Evidence of criminal charges, crimes, wrongs, or acts can be admissible for the limited purpose of

---

[9] Defense counsel may have objected to similar testimony from Tom because Tom may have testified to incriminating facts or statements made by Tim that were not included in the testimony to which defense counsel later stipulated.

15

establishing motive.  See Commonwealth v. Reid, 811 A.2d 530, 550 (Pa. 2002);

Commonwealth v. Glover, 286 A.2d 349, 351 (Pa. 1972).

Under Pennsylvania Rule of Evidence 404(b), character evidence is inadmissible

to prove conduct, but other crimes, wrongs, or acts can be admissible under certain

exceptions.  404(b) provides:

> (1) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.
> (2) Evidence of other crimes, wrongs, or acts may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge . . . .
> (3) Evidence of other crimes wrongs, or acts proffered under subsection (b)(2) of this rule may be admitted in a criminal case only upon a showing that the probative value of the evidence outweighs its potential for prejudice.

PA. R.E. 404(b).  This evidence regarding Tim's juvenile proceedings would likely have

been admissible under Pennsylvania Rule of Evidence 404(b).[10]  Tim argues that defense

counsel's failure to request a limiting instruction for this evidence was deficient

performance of counsel.  However, the statement was merely that Tim had "a separate

juvenile charge, that juvenile charge having nothing to do with the case," so it is unlikely

that this statement would unduly prejudice Tim's defense or lead a jury to make improper

conclusions regarding character in a murder trial.

Because the state court's decision regarding the stipulation was not objectively

unreasonable, we need not inquire into prejudice.  Even if defense counsel did not

---

[10] Although Tim claims that this evidence would be prohibited by 42 Pa. C.S.A. § 6354, the disposition of a child may be used against the child "in a criminal proceeding, if the child was adjudicated delinquent for an offense, the evidence of which would be admissible if committed by an adult."  42 Pa. C.S.A. § 6354(b)(4).

stipulate to the admission of the juvenile proceedings, the fact that the evidence was likely admissible to prove motive and that Tom testified to talking with Tim about Tim "turning himself in" to "the law" would have made it reasonable for the state court to conclude that the trial result would have been the same, even without the stipulation.[11]

### C.       Testimony of Sara Brant

At trial, the Commonwealth asked Tom about a statement he allegedly made to David, David's girlfriend (Sara Brant), and David's mother (Linda Pollard). Defense counsel objected to the question. Outside of the jury's presence, the Commonwealth stated that they were trying to introduce statements Tom allegedly made. Specifically, his statement that, if he and Tim thought "pigs" were at their door, "they" would shoot. (App. at 117a–20a.) The Court declined to admit the statement because it was hearsay unless Tim, not Tom, had made the statement. (App. at 120a.) The Commonwealth tried, once again, to ask Tom about the statement. Defense counsel objected and, after a sidebar, Tom denied making the alleged statement to Linda Pollard. Defense counsel called Sara Brant and solicited testimony from her regarding the same statement. She said that she heard Tom tell David the day before the shooting that David, "better make sure that they knew who he was when he came or else they'd shoot." (App. at 592a– 93a.)

The Superior Court was not objectively unreasonable when it found that defense counsel soliciting this testimony from Sara Brant was not deficient performance. The

---

[11] On direct examination, defense counsel solicited testimony from Tim regarding his "burglary charge" and Tim leaving the juvenile facility. (App. at 597a.)

17

Court found that trial counsel had a "reasonable strategic basis" for this decision; trial counsel testified that the testimony fit into Tim's defense theory. (App. at 1165a.) Although Tim argues that this testimony fit the Commonwealth's theory and not the defense theory, it is not objectively unreasonable to conclude that defense counsel might have reasonably chosen to use the testimony "to show that it was more plausible for Tom to be the shooter because he was the person who" stated that "we'd shoot." (App. at 1165a–66a.) That defense counsel objected to the Commonwealth's earlier attempts to solicit similar testimony from Tom does not make counsel's subsequent solicitation of this testimony unreasonable.

Because the Superior Court was not objectively unreasonable in finding that this solicitation of testimony was not error, we need not inquire into prejudice.

### D. Testimony of Linda Pollard

During the direct examination of Linda Pollard, David's mother, the Commonwealth solicited testimony that David had a child "on the way" and that David had planned to marry Sara Brant. (App. at 417a.) Defense counsel did not object. Tim argues that the lack of objection deprived him of his Sixth Amendment right to counsel.

The state court was not objectively unreasonable in finding that the failure to object did not prejudice Tim's defense. Even though this testimony was arguably irrelevant, Tim did not demonstrate that these statements were "so serious as to deprive the defendant of a fair trial" or that, but for the failure to object, the result of the proceeding would have been different. Strickland, 466 U.S. at 687.

18

Because the state court was not objectively unreasonable in reaching its conclusion regarding prejudice on this concern, we need not inquire into whether defense counsel was deficient.

**E.      The aggregated alleged deficiencies**

Finally, Tim argues that the state court unreasonably concluded that counsel's errors, in the aggregate, were prejudicial under Strickland.[12]  This argument is foreclosed by the fact that, with the potential exception of the testimony of Linda Pollard, we have upheld the state court's findings that counsel's performance was not otherwise deficient. Here, counsel's alleged errors, individually or collectively, do not amount to a constitutional violation.

**IV. CONCLUSION**

For the reasons set forth above, we will affirm.

---

[12] The language of Strickland implies that, while alleged errors may not individually be deficient performance of counsel or prejudicial to the defense, the errors may be deficient performance of counsel or prejudicial when combined.  See Strickland,  466 U.S. at 687 (referring to analyzing errors, in plural, in the standard for ineffective assistance of counsel — showing that counsel's performance was deficient "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and showing the deficient performance prejudiced the defendant "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial" (emphasis added)).